**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Monadnock View Holdings, LLC, et al.**

      **v.**                                        Case No. 05-cv-449-PB
                                              Opinion No. 2006 DNH 147
**Town of Peterborough, et al.**

**MEMORANDUM AND ORDER**

Monadnock View Holdings, LLC[1] ("MVH") has struggled for
several years to commercially exploit properties it controls in
the Town of Peterborough, New Hampshire.  Because its properties
are located in zoning districts that do not permit commercial
uses, it sought variances on several occasions to authorize what
it cannot do as of right.  When this strategy proved less than
completely successful, it sought and failed to obtain approvals
to re-zone the properties.

---

[1] Highland Springs, Inc., a wholly owned subsidiary of MVH
is also a named plaintiff.  I refer to both plaintiffs
collectively as "MVH."

In this action, MVH charges that Peterborough[2] and several Town officials (collectively "Municipal Defendants") violated its rights under the Constitution's Equal Protection Clause, Due Process Clause, and Takings Clause by illegally conspiring to block MVH's development plans.  It also charges that the Municipal Defendants and a business competitor[3] violated the Sherman Antitrust Act.  Defendants have moved to dismiss on several grounds.  In granting their motions, I conclude that MVH's equal protection claim fails to state a viable cause of action, its due process and takings claims fail because MVH declined to pursue available state remedies, and its antitrust

---

[2]   MVH has sued the Town of Peterborough, its Board of Selectmen ("BOS"), its Zoning Board of Adjustment ("ZBA"), and its Planning Board.

[3]   Defendant Barking Dog Water, LLC. ("Barking Dog") which formed in May, 2003, is a New Hampshire corporation and a competitor of MVH.  (Complaint 2, 9).  In its complaint, MVH alleges that some of the Municipal Defendants have close ties with Barking Dog.  Specifically, MVH notes that: (1) Defendant Roberta Bass serves as the Managing Member of Barking Dog and is also a member of the Planning Board (Complaint 2); (2) Defendant John Ratigan, Esq. is Peterborough Town Counsel and the registered agent and counsel for Barking Dog (Complaint 2); and (3) Defendant Elizabeth Thomas Marshall is a member of the Peterborough Board of Selectmen and the Peterborough Water Resources Committee, and she maintains a close relationship with Roberta Bass.

claim is barred by state action immunity and Noerr-Pennington
immunity.[4]

## I. __BACKGROUND__[5]

MVH is a New Hampshire corporation engaged in the spring
water bottling business.  It owns a 300-acre tract of land in
Peterborough, New Hampshire, containing a 35,000 square-foot
stone barn of historical significance and two spring water wells
(the "Stone Barn Property").  (Complaint 3).

The Stone Barn Property spans two of Peterborough's zoning
districts.  Old Street Barn, LLC v. Town of Peterborough, 147
N.H. 254, 255 (2001).  The stone barn and the two spring water
wells are located in the rural zoning district.  Access to the
wells is obtained through a portion of the property located in

---

[4]  MVH also asserts several state law claims: (1) tortious
interference with business relationships; (2) "abuse of office;"
(3) "violation of R.S.A. 91-A;" and (4) "bad faith conduct by
government officials."  Because I dismiss MVH's federal claims, I
decline to exercise supplemental jurisdiction over these state
law claims and do not consider them here.

[5]  The facts in the background section are drawn primarily
from the complaint and, for purposes of these motions, will be
construed in the light most favorable to MVH.  References to
relevant ZBA Minutes and other court actions brought by MVH or
its predecessors are included solely for contextual purposes.

the family zoning district.  Id.  Although the State of New
Hampshire has issued a groundwater withdrawal permit for the site
that places no restrictions on water withdrawals (Complaint 3),
the town's Zoning Board of Adjustment ("ZBA") determined in 1990
that the town's zoning ordinance limited the amount of water
MVH's predecessor in title could withdraw from the property to
two 7,000-gallon tank truck loads per day.  Id.[6]  In 1998, MVH's
predecessor sought permission to modify the ZBA's 1990 ruling to
permit the withdrawal of up to four 8,200-gallon tank truck loads
per day.  The ZBA denied this request and MVH's predecessor
challenged the ruling in state court.  Id.  In upholding the
town's decision, the New Hampshire Supreme Court determined that

> the plain language of the Ordinance simply
> does not contemplate using the property for a
> commercial venture involving pumping and
> removing four 8,200-gallon tank trucks of
> water per day.  Because the proposed use is
> not expressly permitted by the Ordinance, it
> is prohibited as a matter of law unless the
> plaintiff first obtains a special exception
> or a variance.

_____

[6]  Although the Zoning Ordinance did not permit commercial
uses in either the rural district or the family district, the
town determined that the owner of the Stone Barn Property had a
common law right to make the approved  withdrawals.  Id.  This
ruling was unsuccessfully challenged by abutters in Superior
Court.  Id.

Id. at 258 (internal citations omitted).

MVH has made several efforts since 1998 to develop the Stone Barn Property and to expand its spring water business.  In the sections that follow, I first describe developments that are relevant to its current claims and then identify the allegations of impropriety that MVH levies against the defendants.

**A.   <u>Bulk Transfer Variance Requests</u>**

On April 2, 2003, MVH[7] applied to the ZBA for a variance ("Bulk Transfer Request 1") to establish a water transfer station on a property located on N.H. Route 101, which it had contracted to purchase for this purpose (the "Route 101 property"). (Complaint 5-6).  The ZBA denied Bulk Transfer Request 1 on April 2, 2003, citing diminution in property values and increased traffic noise as reasons.  (Complaint 7).

On May 2, 2003, MVH filed a motion for rehearing of Bulk Transfer Request 1.  <u>Monadnock View Holdings, LLC</u>, 03-E-0264 at 2 n.2.  The ZBA unanimously denied the request on May 8, 2003,

---

[7]   The actual applicant was Peterborough Spring Water, Inc., MVH's predecessor in interest to its contract to purchase the Route 101 property.  <u>Monadnock Holdings, LLC v. Town of Peterborough, et al</u>, Hillsborough County Superior Court, North, Docket No. 03-E-264 at 3 (Nov. 3, 2003).

reasoning that no "new information [was] provided which could not have been made available at the time of the public hearing of the case." (May 8, 2003 ZBA Minutes at 8-9). MVH appealed this ruling to the Superior Court for the Northern District of Hillsborough County, New Hampshire (the "Superior Court"), challenging the ZBA decision and alleging that the ZBA had violated its right to equal protection. <u>Monadnock View Holdings, LLC</u>, 03-E-264 at 3. On November 3, 2003, the Superior Court affirmed the ZBA's decision. <u>Id.</u> at 13-14. With respect to MVH's equal protection claim, the Superior Court specifically held that MVH was not "similarly situated" to the other landowner at issue. <u>Id.</u> at 11.

MVH then brought a new, revised Route 101 variance request ("Bulk Transfer Request 2"). (Complaint 8); (July 7, 2003 ZBA Minutes at 2). The ZBA denied Bulk Transfer Request 2 on July 7, 2003, reasoning that the facts presented in the application were "not materially different in nature and degree than the original application." (July 7, 2003 Minutes at 5). The record does not reveal whether any appeal was taken from this ruling.

**B.   <u>Stone Barn Demolition Permit</u>**

On April 10, 2003, a few days after the ZBA had denied Bulk
Transfer Request 1, MVH applied for a demolition permit to
dismantle the Stone Barn structure and sell it piecemeal.
(Complaint 7).  Although the town initially granted the permit on
April 11, 2003, it revoked the permit on April 23, 2003 because
of technical defects in MVH's application.  At the demolition
permit revocation meeting, the Peterborough Board of Selectmen
("BOS") instructed one selectmen to begin negotiating on the
town's behalf to purchase the Stone Barn structure.  (Complaint
7). (Doc. 19, Exhibit C).

On April 28, 2003, the Peterborough Heritage and
Conservation Commissions ("Commissions") met to discuss the
conservation factors and federal regulations implicated by MVH's
demolition proposal, as well as possible future development of
the Stone Barn property.  (Complaint 8).  The Commissions then
began to assist MVH with data preparation in contemplation of a
variance request for the Stone Barn property.  (Complaint 8).  On
May 15, 2003 MVH submitted a revised demolition permit for the
Stone Barn structure.  (Complaint 8).  The BOS granted the
demolition permit on June 6, 2003, but MVH later decided not to
demolish the structure.

**C.   Rezonings**

After MVH failed to obtain variances, it proposed two ballot initiatives to be voted upon at the next town meeting.  One of the initiatives sought a re-zoning of the Stone Barn property to enable MVH to convert the Stone Barn into a restaurant/inn ("Restaurant/Inn Initiative"), and the other sought to re-zone the Route 101 property so that MVH could operate a bulk water transfer station there ("Bulk Transfer Initiative").[8]  (Complaint 11).  On December 11, 2003, the Heritage Commission decided to support MVH's ballot initiatives if MVH would agree to specified conditions on its use of the land.  (Complaint 11).  On February 19, 2004, MVH agreed to the conditions.  (Complaint 11-12).  Specifically, MVH agreed to dedicate $100,000 per year to improving the Stone Barn structure and to fund a $50,000 escrow account to compensate neighbors in the event of adverse water impact.  (Complaint 12).  Because MVH accepted these conditions, the Heritage Commission agreed to support MVH's ballot

---

[8]  The complaint states that MVH "put forward" two ballot initiatives "including the development of an Inn/Restaurant at Stone Barn and the Bulk Transfer Water Station."  (Complaint 11). I interpret this statement to mean that MVH sought to have the Stone Barn and Route 101 properties re-zoned at a town meeting.

initiatives.  (Complaint 12).

New Hampshire law requires the Peterborough Planning Board ("Planning Board") to hold a public hearing on all zoning amendments and to note its approval or disapproval of each amendment on the town meeting ballots.  See RSA 675:4.  At a January 5, 2004 public hearing the Planning Board decided not to support the initiatives.  (Complaint 13).  Accordingly, when the initiatives were voted upon, the ballots indicated that the Planning Board did not support them.  (Complaint 12).  On March 9, 2004, voters rejected both initiatives.  (Complaint 13).

**D.    Restaurant Variance**

On April 12, 2005, MVH requested a variance from the ZBA to operate a restaurant/inn on the Stone Barn property. ("Restaurant/Inn Request").  (Complaint 16).  The ZBA discussed the request over the course of its next three meetings, but denied the variance on May 17, 2005, reasoning that such an operation might diminish neighboring property values and that granting the variance would be contrary to the public interest. (Complaint 17).  The record does not reveal whether an appeal was taken from this ruling.

**E.   <u>MVH's Allegations of Impropriety</u>**

MVH alleges that the adverse municipal decisions described above resulted from conflicts of interest and biases of the defendants.  Specifically, MVH alleges that the defendants engaged in the following improper conduct:

At a May 27, 2003 non-public executive session of the BOS, Marshall stated that, in her opinion, a water transfer station for MVH was not acceptable "under any circumstances."  (Complaint 9).  The BOS also noted at this meeting that it would like to see the town as the owner of the Stone Barn structure.[9]  (Complaint 9).

Prior to the July 7, 2003 meeting where the ZBA considered Bulk Transfer Request 2, Ratigan advised ZBA on steps to quash MVH's application.  (Complaint 10).  At this time, he did not disclose that he was counsel for Barking Dog.  (Complaint 9-10).  At this meeting, the ZBA did not allow testimony from MVH's

---

[9]  MVH alleges that over the next several years the town actively attempted to purchase the Stone Barn property with the intention of using water revenues from its springs to restore and maintain the Stone Barn structure.  Specifically, MVH asserts that the town took affirmative steps such as placing a phone call to MVH's attorney regarding a possible purchase of the property and empowering a selectman to purchase the property at foreclosure proceedings.  (Complaint 11, 15).

expert witnesses or from members of the Commissions. (Complaint 10).  Additionally, the ZBA refused MVH's attorney's request to explain how Bulk Transfer Request 2 differed from Bulk Transfer Request 1.  (Complaint 10).

In December 2003, when the Planning Board discussed Restaurant/Inn Initiative and Bulk Transfer Initiative, Bass, a board member and manager of competitor Barking Dog, participated in the discussions and did not recuse herself.  Similarly, she did not recuse herself on January 5, 2004 when the Planning Board voted to oppose the ballot initiatives.  (Complaint 12).  MVH alleges that this conflict of interest tainted its two ballot initiatives.

On May 26, June 14, June 23, and July 8, 2004, Ratigan appeared before the Town of Sharon Zoning Board of Adjustment on behalf of Barking Dog and espoused many of the same ideas he had rejected when advising the Municipal Defendants with respect to MVH.  (Complaint 13).  On August 12, 2004, Ratigan appeared with Bass on behalf of Barking Dog in front of the Town of Jaffrey Zoning Board.  (Complaint 13).  In these meetings, Ratigan noted that the Town of Peterborough was a "likely customer" for Barking Dog's water resources.  (Complaint 14).  A newspaper

-11-

advertisement also cited Ratigan as referring to Restaurant/Inn Request as "illegal spot zoning."

In February 2004, Ratigan said the conditions accepted by MVH in exchange for the Commissions' support of its ballot initiatives did not "certify 'intent and compliance'" and demanded that escrow funds be in place immediately, or the Commissions would not be permitted to support the initiatives. (Complaint 13).

Marshall, a regular contributor to the *Peterborough Transcript*, used her newspaper column to sway public opinion against MVH's desired property uses.  (Complaint 12).  In one instance, on April 14, 2004, Marshall inflated the potential profits MVH could realize if it were able to exploit its property.  (Complaint 14).  This column did not, however, mention the projected or actual profits of Barking Dog or any of MVH's other competitors in the spring water business.  (Complaint 14). Later, in the summer of 2004, Marshall contacted the New Hampshire Department of Environmental Services to determine how the town could stop MVH's future water withdrawal plans. (Complaint 14).

Finally, prior to the May 17, 2005 ZBA meeting, Ratigan

instructed the ZBA how to deny Restaurant/Inn Request.
(Complaint 17).

## II. <u>STANDARD OF REVIEW</u>

When ruling on a motion to dismiss under Fed. R. Civ. P.
12(b)(6), I must "accept as true the well-pleaded factual
allegations of the complaint, draw all reasonable inferences
therefrom in the plaintiff's favor and determine whether the
complaint, so read, sets forth facts sufficient to justify
recovery on any cognizable theory." <u>Martin v. Applied Cellular
Technology, Inc.</u>, 284 F.3d 1, 6 (1st Cir. 2002). Dismissal is
appropriate only if "it clearly appears, according to the facts
alleged, that the plaintiff cannot recover on any viable theory."
<u>Langadinos v. American Airlines, Inc.</u>, 199 F.3d 68, 69 (1st Cir.
2000) (quotation omitted).

Despite the liberal pleading requirements established by the
federal rules, I need not accept subjective characterizations,
bald assertions, or unsubstantiated conclusions. <u>See</u> <u>Dewey v.
Univ. of N.H.</u>, 694 F.2d 1, 3 (1st Cir. 1982). The issue is not
"what the plaintiff is required ultimately to prove in order to

prevail on her claim, but rather what she is required to plead in order to be permitted to develop her case for eventual adjudication on the merits." <u>Gorski v. N.H. Dep't of Corr.</u>, 290 F.3d 466, 472 (1st Cir. 2002) (emphasis in original).


### III. <u>ANALYSIS</u>

MVH contends that the Municipal Defendants violated its rights under the Constitution's Equal Protection Clause, Due Process Clause, and Takings Clause.  It also argues that the Municipal Defendants and Barking Dog violated the Sherman Antitrust Act.  I address each claim in turn.

### A.   <u>Equal Protection</u>

To state an equal protection claim, a plaintiff generally must allege membership in a protected class or group.  In certain circumstances, however, an equal protection claim may be based on a "class of one." <u>Donovan v. City of Haverhill</u>, 311 F.3d 74, 77 (1st Cir. 2002) (quoting <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000) (per curiam)).  When pleading an equal protection claim based on a class of one, a plaintiff must allege that it has "been intentionally treated differently from others

similarly situated and that there is no rational basis for the difference in treatment."  See id. (quoting Olech, 528 U.S. 562 at 564).

The formula for determining whether certain entities are "similarly situated" is not a bright line test.  Barrington Cove, LP v. R.I. Hous. and Mortgage Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001).  The First Circuit has explained that "[t]he test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated."  Id. (citation omitted).  The relevant facts to consider "are those factual elements which determine whether reasoned analogy supports, or demands, a like result."  Id. (citation omitted).  Thus, to satisfy the "similarly situated" element, a plaintiff must demonstrate that it was similarly situated "in all relevant respects."  Id. (citation omitted). When a complaint cannot reasonably be construed to permit such a finding, dismissal is warranted.  Id.

MVH offers three bases for its equal protection claim. First, it alleges that it was treated differently from a competing water company--Upland Farms--because Upland Farms was

granted a special exception to operate a water transfer facility while MVH's Bulk Transfer Requests were denied.  Next, MVH argues that the Municipal Defendants treated it differently than another competitor--Barking Dog--because they supported Barking Dog's application to a state agency for a water withdrawal permit. Finally, MVH alleges that it "was treated differently than other similarly situated businesses during the same period and under the same rules and requirements."  For the reasons set forth below, none of these arguments support a viable equal protection claim.

With respect to its first argument, MVH is collaterally estopped from asserting that it was similarly situated to Upland Farms because it previously litigated and lost on this issue in Superior Court.  For collateral estoppel to apply, the following elements must be satisfied:  "(1) an identity of issues (that is, that the issue sought to be precluded is the same as that which was involved in the prior proceeding), (2) actuality of litigation (that is, that the point was actually litigated in the earlier proceeding), (3) finality of the earlier resolution (that is, that the issue was determined by a valid and binding final

-16-

judgment or order), and (4) the centrality of the adjudication (that is, that the determination of the issue in the prior proceeding was essential to the final judgment or order)." Gonzalez-Pina v. Guillermo Rodriguez, 407 F.3d 425, 430 (1st Cir. 2005).

The issue litigated in Superior Court--whether MVH and Upland Farms were "similarly situated" for equal protection purposes--is identical to the second element MVH must satisfy to state an equal protection claim here.[10]  It is also clear from the record that MVH actually litigated the issue.  See Monadnock View Holdings, LLC at 10 ("[MVH] next argues that ZBA violated its right to equal protection under the laws. . . .  The first question in an equal protection analysis is whether the State action in question treats similarly situated persons differently").  Further, the Superior Court issued a final

_____

[10]  The only arguable difference between the issues is a technical one:  the Superior Court decided the equal protection issue on state--rather than federal--constitutional grounds.  The element under the state equal protection standard, however, is identical to that under the federal standard.  See In re Wintle, 146 N.H. 664, 667 (2001) ("The first question in an equal protection analysis is whether the State action in question treats similarly situated persons differently.") (citation omitted).

judgment on this issue, specifically holding that Upland Farms
and MVH were not similarly situated because Upland Farms'
property was the site of a prior existing non-conforming use,
whereas MVH's was not.  Id. at 11.  Finally, this finding was
essential to the Superior Court's judgment.  See id. at 13-14.
Thus, MVH is collaterally estopped from relitigating the
"similarly situated" element with respect to Upland Farms and
therefore cannot state an equal protection claim on this ground.

Next, MVH alleges that the Municipal Defendants treated it
differently than Barking Dog.  Specifically, MVH asserts that the
Municipal Defendants "supported [Barking Dog's] application to
[the] New Hampshire Department of Environmental Services" to
withdraw large quantities of water.  (Complaint 16).  MVH does
not allege, however, that any of the defendants opposed any
similar request it had made to the Department of Environmental
Services.  Nor does MVH allege that Barking Dog sought or was
granted variances, demolition permits, or rezonings similar to
those denied MVH.  In fact, MVH does not even allege that Barking
Dog ever attempted to conduct business in Peterborough.  Under
these circumstances, MVH has failed to allege that it was

"similarly situated" to Barking Dog "in all relevant respects."

Therefore, it has not stated a cognizable equal protection claim.

Finally, MVH alleges that it "was treated differently than

other similarly situated businesses during the same period and

under the same rules and requirements."[11]  MVH does not, however,

indicate which "similarly situated businesses" were treated

differently or describe the nature of this disparate treatment.

Bald conclusions of this type are not sufficient to support a

claim.  See Dewey, 694 F.2d at 3.  Accordingly, MVH has again

failed to state an equal protection claim.

**B.   Due Process**

MVH next alleges that the Municipal Defendants violated its

procedural due process rights by denying it an impartial decision

maker.  (Complaint at 21).[12]  Specifically, MVH argues that the

---

[11]  MVH also seems to claim that Peterborough's taxation of
the Stone Barn Property as a commercial property gives rise to an
equal protection claim because the Town has prevented it from
using the property for commercial purposes.  However, MVH admits
in the complaint that it is permitted to transport two truckloads
of water per day from the property––an inherently commercial use.

[12]  MVH also asserts that the Municipal Defendants' conduct
violated its substantive due process rights.  I view this,
however, as merely an effort to recharacterize as substantive a
claim that is inherently procedural.  "[R]ejections of
development projects and refusals to issue building permits do

-19-

alleged conflicts of interest of Bass, Ratigan, and Marshall described above tainted the town's decision making process at the ZBA hearings, the Planning Board meetings, and derivatively at the town meeting where MVH's ballot initiatives were defeated. MVH also alleges that the selectmen and ZBA were biased because they wanted the town to purchase the Stone Barn property.

To state a procedural due process claim, a plaintiff "must allege first that it has a property interest as defined by state law and, second, that the defendants, acting under color of state law, deprived it of that property interest without

_____

not ordinarily implicate substantive due process." SFW Arecibo, Ltd. v. Rodriguez, 415 F.3d 135, 141 (1st Cir. 2005) (quoting PFZ Properties, Inc. v. Rodriguez, 928 F.2d 28, 31 (1st Cir. 1991)). This is true even where "officials have allegedly violated state law or administrative procedures. Id. To be sure, the First Circuit has "left the door slightly ajar for federal relief [based on substantive due process] in truly horrendous situations," but it has been clear that "the threshold for establishing the requisite abuse of government power is a high one indeed." SFW Arecibo, Ltd., 415 F.3d at 141 (citation and internal quotation marks omitted). Here, MVH has not pleaded facts sufficient to satisfy this threshold. See SFW Arecibo, Ltd., 415 F.3d at 141 (affirming dismissal of substantive due process claim where plaintiffs alleged that a planning board made an erroneous decision in violation of state law ); PFZ Properties, Inc., 928 F.2d at 32 (affirming dismissal of substantive due process claim where plaintiff alleged that a permitting authority arbitrarily and capriciously refused to process its approved construction drawings).  MVH does not come close to meeting this difficult standard.

constitutionally adequate process." <u>SFW Arecibo, Ltd.</u>, 415 F.3d at 139 (quoting <u>PFZ Properties, Inc.</u>, 928 F.2d at 30) (internal quotation marks omitted).  However, when a deprivation of a property interest results from "random and unauthorized conduct of state actors, the due process analysis is initially "limited to the issue of the adequacy of the postdeprivation remedies provided by the state." <u>Hadfield v. McDonough</u>, 407 F.3d 11, 19 (1st Cir. 2005) (citations omitted).  In other words, public entities are shielded from federal due process claims where "the denial of process was caused by the random and unauthorized conduct of government officials and where the state has provided adequate postdeprivation remedies to correct the officials' random and unauthorized acts." <u>Id.</u> at 19-20 (citations omitted). Conduct is considered random and unauthorized "when the challenged state action is a flaw in the official's conduct rather than a flaw in the state law itself." <u>Id.</u> at 20 (citations omitted).

Here, MVH does not allege that the laws of New Hampshire are flawed.  Rather, it alleges only that the Municipal Defendants' conduct constituted a violation or misapplication of state law.

In other words, MVH alleges essentially that the conduct was random and unauthorized.  Thus, I need only determine whether the postdeprivation remedies available to MVH were adequate.  See PFZ Properties, Inc., 928 F.2d at 31.  I hold that they were.

Under New Hampshire law, MVH had the right to apply to the ZBA for a rehearing with respect to the ZBA's denials of Bulk Transfer Request 1, Bulk Transfer Request 2, and the Restaurant/ Inn Request.  See RSA 677:2.  Further, if MVH believed that the ZBA's decisions were "illegal or unreasonable," it could have appealed to a New Hampshire superior court, specifying the grounds upon which the decisions were allegedly illegal or unreasonable.  See RSA 677:4.[13]

With respect to the BOS's revocation of the demolition permit for the Stone Barn property, MVH was entitled to appeal to the ZBA.  See Peterborough Land Use Regulations, Chapter 207-10. In the event of an adverse ZBA decision, MVH could have applied

---

[13]  Additionally, MVH notes in its complaint that in February 2002, the ZBA denied a request to create a circular turnaround on the Stone Barn Property.  (Complaint 4).  To the extent that MVH's complaint can be construed to assert a due process claim on this ground, the same post-deprivation remedies described with respect to its other variance requests were available.

first for a rehearing, and then--as described above--to the superior court.  See RSA 677:2, 677:4.

Finally, with respect to the defeat of MVH's ballot initiatives.  MVH could have applied for rehearing to the BOS, basing its complaint on the allegedly tainted ballots.  See RSA 677:2.  It could then have appealed an unfavorable ruling by the selectmen to the superior court.  See RSA 677:4.

The First Circuit has made it clear that a combination of postdeprivation administrative and judicial remedies satisfies due process in the context of local land use decisions.  See SFW Arecibo, Ltd., 415 F.3d at 140; PFZ Properties, Inc., 928 F.2d at 31.  Thus, the New Hampshire postdeprivation remedies described above were adequate, and MVH's procedural due process claim fails.  See PFZ Properties, Inc., 928 F.2d at 31 (reasoning that post-deprivation remedies virtually identical to the New Hampshire procedures described above satisfy due process).

C.   **Takings Clause**

MVH next alleges that the actions of the Municipal Defendants constituted takings of its properties without just compensation.  Specifically, MVH presents both a physical taking

claim and a regulatory taking claim.  With respect to its
physical takings claim, MVH alleges that the town's construction
and continued use of a trailhead on the Stone Barn property over
an easement it owns constitutes a physical taking without just
compensation.  With respect to its regulatory taking claim, MVH
alleges that the Municipal Defendants' denials of its variance
requests diminished the values of the Stone Barn and Route 101
properties, effectively depriving MVH of the use of its
properties.  Each of MVH's takings theories are rooted in the
doctrine of inverse condemnation, which applies when a government
entity effectively takes property without formally exercising its
eminent domain power.  For the reasons set forth below, neither
argument states a cognizable takings claim.

In order for a federal takings claim to be ripe for review,
a plaintiff must demonstrate that two prerequisites have been
met: (1) "the government entity charged with implementing the
regulations has reached a final decision regarding the
application of the regulations to the property at issue (the
'final decision requirement')"; (2) "the plaintiff sought (and
was denied) just compensation by means of an adequate state

procedure (the 'state action requirement')."  Pascoag Reservoir &
Dam, LLC v. Rhode Island, 337 F.3d 87, 91 (1st Cir. 2003) (citing
Williamson County Regional Planning Comm'n v. Hamilton Bank, 473
U.S. 172, 186 (1985)).  In this case, both of MVH's takings
claims fail because it has failed to satisfy the state action
requirement.

The state action requirement mandates that "if state law
provides an adequate process for obtaining compensation, and
resort to that process holds out some realistic promise of
yielding just compensation," a plaintiff may not seek
compensation in federal court without first exhausting the state
procedures.  Id. at 92.  Here, Article XII of the New Hampshire
constitution protects citizens from government takings of private
property, and New Hampshire state courts allow recovery through
inverse condemnation proceedings for both physical and regulatory
takings.  See, e.g., Arcidi v. Town of Rye, 150 N.H. 694, 698
(2004) ("When [inverse condemnation] occurs, the governmental
body has committed an unconstitutional taking and the property
owner has a cause of action for compensation"); Rowe v. Town of
North Hampton, 131 N.H. 424, 430-33 (1989) (discussing New

Hampshire regulatory takings proceedings).  MVH does not allege that it sought and was denied just compensation through the available state inverse condemnation procedures.  Thus, absent an exception to the state action requirement, MVH's takings claims are not ripe for review.

MVH argues that its claims fall within a futility exception--recognized by some courts--to the state action requirement. However, MVH alleges no facts to suggest that New Hampshire state courts would not have been receptive to its takings claims or that those courts were infected with the same alleged biases as the Municipal Defendants.  In short, MVH has provided no "compelling explanation for not using [New Hampshire's] state procedures."  Pascoag Reservoir & Dam, LLC, 337 F.3d at 93. Accordingly, MVH's takings claims fail.

D.    **Antitrust Claim**

MVH also brings a Sherman Act claim against the Municipal Defendants and Barking Dog, alleging that they engaged in a conspiracy to block its development plans.  I consider MVH's antitrust claim against each set of defendants in turn.

1.    **The Municipal Defendants**

-26-

The First Circuit has recognized the general rule that "any action that qualifies as state action is ipso facto exempt from operation of the antitrust laws." Fisichelli v. City Known as Town of Methuen, 956 F.2d 12, 14–15 (1st Cir. 1992) (citation and internal quotation marks omitted).  This exemption has come to be known as state action immunity.[14]  For state action immunity to apply, two requirements must be met: (1) "the challenged restraint [on trade] must be one clearly articulated and affirmatively expressed as state policy" (the "authorization requirement"), and (2) "the policy must be actively supervised by the State itself."  Arroyo–Melicio v. Puerto Rican American Insurance Co., 398 F.3d 56, 71 (1st Cir. 2005) (quoting Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc, 445 U.S. 97, 105 (1980)) (internal quotation marks omitted).

---

[14]  Although the Municipal Defendants do not raise it as a defense, the Local Government Antitrust Act of 1984 ("LGAA") also immunizes them from MVH's damages claims.  15 U.S.C. §§ 34–36; GFC Gaming Corp. v. City of Black Hawk, Colorado, 405 F.3d 876, 884–85 (10th Cir. 2005).  The LGAA bars recovery of damages, interest on damages, costs, or attorney's fees from any "local government, or official or employee thereof acting in an official capacity."  15 U.S.C. § 35(a); GFC Gaming Corp., 405 F.3d at 885. Here, the Municipal Defendants are local government officials who were acting in their official capacities.  Thus, they are "immune from damages for violations of the Sherman Act."  See GFC Gaming Corp., 405 F.3d at 885.

The active state supervision requirement does not apply, however, where, as here, the defendant is a municipality.  <u>Town of Hallie v. City of Eau Claire</u>, 471 U.S. 34, 46 (1985).  Thus, I need only determine whether the restraints on trade challenged by MVH resulted from clearly articulated and affirmatively expressed state policy.  For the reasons set forth below, I hold that they do.

In order for the authorization requirement to be satisfied, the state need only "provide[] the municipality with a general grant of authority to take actions of the *sort* in question." <u>Fisichelli</u>, 956 F.2d at 14 (citation and quotation marks omitted).  If "municipal decisions represent, *on their face*, a proper exercise of municipal authority, an antitrust court normally should not examine whether the *manner* of its exercise was improper."  <u>Id.</u>  This principle extends even to situations where the action is alleged to be unlawful due to "the influence of an improper motive."  <u>Id.</u>  In short, a municipal anti-competitive restriction satisfies the authorization requirement as long as it is the "foreseeable result" of what a state statute authorizes.  <u>Id.</u> (citations and quotation marks omitted).

Here, Peterborough's anti-competitive restrictions--zoning and permitting regulations--satisfy the authorization requirement.  Not only could the New Hampshire legislature reasonably foresee that these regulations would restrict competition, but it explicitly acknowledged it.  See RSA 672:1, 1 ("Planning, zoning and related regulations have been and should continue to be the responsibility of municipal government."); RSA 672:1, VI ("It is the policy of this state that competition and enterprise may be so displaced or limited by municipalities in the exercise of the powers and authority provided in this [Planning and Zoning] title as may be necessary to carry out the purposes of this title.").  Regardless of any improper motive, the Municipal Defendants' denials of variances, rezonings, and demolition permits represent a facially proper exercise of municipal authority. Thus, absent an exception to the doctrine, defendants' actions are protected by state action immunity.

MVH argues that state action immunity does not apply because the Municipal Defendants' actions fall within the market participant exception.  This exception applies when a municipality acts as if it were a private business.  See

-29-

Fisichelli, 956 F.2d at 14–15.  However, MVH has not alleged that the Municipal Defendants bought or sold spring water, or in any other way entered the market for spring water.  Rather, the only actions MVH complains of were the denials of variance and permit applications and the town's contemplated purchase of the Stone Barn property.  MVH's argument that the Municipal Defendants' alleged conspiracy with Barking Dog somehow transforms them into commercial participants also fails.  City of Columbia v. Omni Outdoor Adver., 499 U.S. 365, 374 (1991) (reasoning that "[t]here is no such conspiracy exception"); see also Fisichelli, 956 F.2d at 14 ("[I]n applying the [state action] doctrine, the courts should recognize no exception for conspiracy, bribery, or similar activity.") (citation and internal quotation marks omitted). Thus, the Municipal Defendants are entitled to state action immunity from MVH's antitrust claim.[15]

**2.   Barking Dog**

---

[15]   In addition to naming the Town its various boards in its antitrust claim, MVH has named Marshall and Ratigan individually. However, a plaintiff cannot defeat state action immunity "simply by substituting, for the name of the town, the names of the town officials who approved the challenged municipal action." Fisichelli, 956 F.2d at 15–16.  Thus, MVH's antitrust claims against Marshall and Ratigan fail.

Just as state action is immune from federal antitrust law, so too is the conduct of "private individuals seeking anticompetitive action from the government."  See City of Columbia, 499 U.S. at 379-280.  This has become known as the Noerr-Pennington doctrine.  Here, MVH alleges that Barking Dog––a private entity––engaged in precisely this type of conduct in its attempts to influence local land use controls.  Thus, in the absence of an exception to the doctrine, the Noerr-Pennington doctrine immunizes Barking Dog from MVH's antitrust suit.

MVH argues that the "sham" exception to the Noerr-Pennington doctrine applies.  I disagree.  The "sham" exception only applies where "persons use governmental *process*––as opposed to the *outcome* of that process––as an anticompetitive weapon."  City of Columbia, 499 U.S. at 380.  Specifically, the exception applies only where defendants engage in activities not genuinely directed at seeking desired government action.   Id.

In this case, MVH does not allege that Barking Dog used government *process*, such as instituting meritless proceedings, as an anti-competitive weapon.  In fact, it was MVH that instituted the municipal proceedings at issue here.  MVH instead complains

merely that the *outcome* of the government process was improper. Thus, the "sham" exception to the Noerr–Pennington doctrine does not apply, and MVH's antitrust claim against Barking Dog fails.[16]

---

[16]   To the extent that MVH's complaint can be read to advocate an additional exception to the Noerr–Pennington doctrine based on an illicit conspiracy between Barking Dog and the Municipal Defendants, its claim still fails.  The Supreme Court has explicitly refused to recognize a "conspiracy" exception to the Noerr–Pennington doctrine that would apply where, as MVH alleges here, private parties conspire with government entities for the purpose of stifling competition.  City of Columbia, 499 U.S at 382–83.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, I grant defendants' motions to dismiss MVH's federal claims for failure to state a claim upon which relief can be granted. (Document Nos. 20, 21, 22).  I also decline to exercise supplemental jurisdiction over MVH's state law claims.  MVH's federal claims are dismissed with prejudice. Its state law claims are dismissed without prejudice.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

December 19, 2006

cc:  Douglas Macdonald, Esq.
     Gregg Frame, Esq.
     Charles Bauer, Esq.
     Lisa Lee, Esq.
     William Saturley, Esq.
     Lawrence Edelman, Esq.
     Mark Porada, Esq.